IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN SHULTZ, | ) | CASE NO. 1:14CV1587 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Brian Shultz ("Shultz") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 12.

As set forth more fully below, the Administrative Law Judge ("ALJ") did not find that Shultz's use of a cane prescribed by his doctor was not medically necessary and the ALJ appeared to accept Shultz's testimony about his need for a cane.  Accordingly, the ALJ was required either to include a limitation based on the use of a cane in his hypothetical to the Vocational Expert or explain why he did not include such a limitation.  The ALJ's failure to do either was error.  Accordingly, the Commissioner's decision is **REVERSED** and **REMANDED** for proceedings consistent with this opinion.

### I. Procedural History

In 2009, Shultz applied for SSI and disability insurance benefits; his application was denied. Tr. 139-149.  He filed another application for SSI on March 25, 2011, alleging a disability onset date of October 1, 2005.  Tr. 86, 324.  He alleged disability based on the following: bipolar, seizures, back pain, anxiety, panic attacks, and depression.  Tr. 329.  After denials by the state agency initially (Tr. 170) and on reconsideration (Tr. 186), Shultz requested an administrative hearing.  Tr. 211.  A hearing was held before Administrative Law Judge ("ALJ") David W. Thompson on April 22, 2013.  Tr. 103-134.  In his May 30, 2013, decision (Tr. 86-95), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Shultz can perform, i.e., he is not disabled.  Tr. 93.  Shultz requested review of the ALJ's decision by the Appeals Council (Tr. 194) and, on June 18, 2014, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A.  Personal and Vocational Evidence

Shultz was born in 1964 and was 46 years old on the date his application was filed.  Tr. 93.  He completed ninth grade.  Tr. 330.  He previously worked as an auto detailer and he bussed tables.  Tr. 330.  He last worked in 2003.  Tr. 330.

### B.  Relevant Medical Evidence[1]

Between January and July 2008, while he was incarcerated, Shultz filled out a number of health services request forms for a number of symptoms, including back pain.  *See, e.g.*, Tr. 392-393, 398-399, 409-413.  Additionally, on March 25, 2008, he requested an eye exam in order to

---

[1]  Although Shultz alleged disability based on mental and physical impairments, he only challenges the ALJ's decision regarding his physical impairments related to his back and his alleged illiteracy.  Accordingly, the Court summarizes herein medical records concerning Shultz's relevant physical impairments and alleged illiteracy.

obtain glasses because he "cannot see to sign papers."  Tr. 394.  On July 10, 2008, he reported

that his reading glasses had been lost or stolen and requested another pair.  Tr. 414.  Around July

2008, he wrote a letter complaining that the cashier kept taking money out of his prison account

for his medical visits and asking the prison to look into whey the cashier continued to take

money from his account.  Tr. 606.

On December 1, 2010, Shultz saw Peter J. Greco, M.D., complaining of multiple

problems, including chronic low back pain and lumbar radiculopathy.  Tr. 840.  He was not

taking medication for his back problem.  Tr. 840.  Dr. Greco noted Shultz's "known L5

foraminal narrowing" and that his "exam is not of concern."  Tr. 841.  He also wrote, "Patient is

illiterate."  Tr. 841.

On December 2, 2010, Shultz visited the emergency room complaining of lower right

back pain radiating down his right leg.  Tr. 831.  He stated that his doctor had prescribed Flexeril

but that it was not helping.  Tr. 831.  He reported that he "falls a lot" and losses his balance.  Tr.

832.  The record notes, "Has been staggering to the right due to the pain."  Tr. 832.  He had no

numbness or weakness in his leg.  Tr. 832.  Melissa Tscheiner, M.D., examined him and noted

that he had grossly intact sensation, normal symmetric reflexes, and a normal gait.  Tr. 833.  X-

rays of Shultz's lower back revealed mild levoscoliosis, grade 1-2 spondylolisthesis at the L5-S1

level with associated spondylosis, and disc space narrowing at L5-S1.  Tr. 897.  Dr. Tscheiner

concluded, "No red flags for back pain at this time," noted that Shultz's exam was unremarkable,

and assessed a back sprain, acute on chronic, and lumbar radiculopathy.  Tr. 833.  Shultz was

discharged in stable condition with pain medication and instructed to follow up with his primary

care physician.  Tr. 833.

On December 8, 2010, Shultz reported to a mental health professional that he cannot read or write, he was in the "slow learners' classes," and he quit school in the seventh or eighth grade when he was 16.  Tr. 797.

On December 16, 2010, Shultz was assaulted and taken to the emergency room.  Tr. 820-823.  He complained of right rib, right hip and cervical spine pain.  Tr. 821.  An x-ray showed grade 2 anterolisthesis of L5 on S1 with bilateral pars defects, narrowing of the L5-S1 disc space and a well corticated bony fragment just posterior to the L5 spinous process, probably related to a remote trauma.  Tr. 891.  A CT scan of his cervical spine was normal.  Tr. 892.

On December 20, 2010, Shultz saw Dr. Greco and complained of back pain.  Tr. 818. Dr. Greco noted that Shultz had been treated recently following an assault but that "this is old back pain."  Tr. 818.  Dr. Greco commented that x-rays showed "the same problem as before—narrowing of the disc at L5-S1" and "nothing else."  Tr. 818.  Shultz reported pain in his right anterior thigh while walking, and that a cane helps but that it had been stolen.  Tr. 818.  Upon examination, Dr. Greco noted tender swelling in his right lumbar region, a negative straight leg raise, and a non-antalgic gait.  Tr. 818.  Dr. Greco diagnosed Shultz with low back pain with evidence of muscle spasm.  Tr. 818.

On January 12, 2011, Shultz went to the emergency room complaining of weakness, headache, and shortness of breath.  Tr. 807.  Upon examination, Sara Laskey, M.D., noted that his strength, sensation, and gait were normal.  Tr. 809.

On February 22, 2011, Shultz saw James L. Hill, M.D., for back pain upon referral from Dr. Greco.  Tr. 916.  Shultz reported that his pain was worse on his right side and had been present for five years.  Tr. 916.  Dr. Hill noted that Shultz's previous primary care physician treated his pain with Vicodin, muscle relaxants, and, later, Percocet, but that Dr. Greco did not

want to prescribe opiods because Shultz lived in a shelter.  Tr. 916.  Upon examination, Dr. Hill found Shultz had painful lumbar flexion and extension.  Tr. 917.  His lumbar paravertebral exam was normal.  Tr. 917.  The record notes that Shultz "did not want any intervention just [physical therapy] and meds.  Pt is currently applying for disability."  Tr. 918.  Dr. Hill prescribed pool exercise and ordered a flexion x-ray.  Tr. 918.

On August 2, 2011, Shultz went to the emergency room for treatment after a glass bottle bounced off the ground and hit him in the leg.  Tr. 1110-1111.  Upon examination, he had full range of motion in his extremities and normal strength, sensation, and gait.  Tr. 1111.

On November 9, 2011, Shultz went to the emergency room complaining of back and neck pain after he fell out of a top bunk three times due to seizures. Tr. 1122.  He stated that he had been drinking at the time.  Tr. 1134.  He had not taken any pain medication.  Tr. 1122.  The record notes, "He states that he decline [sic] [physical therapy] and injections."  Tr. 1122.  Upon examination, Rahi Kapur, M.D., observed that Shultz had full range of motion and equal 5/5 strength in all extremities, intact sensation, and no tenderness at his thoracic spine.  Tr. 1123.  A cervical spine CT scan revealed a small central disc protrusion at C3-C4 with no acute fractures.  Tr. 1160-1161.  An x-ray of his lower back revealed degenerative changes most pronounced at L5-S1 where he has disc space narrowing, vacuum disc phenomenon, sclerosis of the articular margins, osteophytic spurring and spondylolisthesis.  Tr. 1126.  Dr. Kapur prescribed Percocet for pain.  Tr. 1124.  Upon discharge, Shultz was able to ambulate with appropriate coordination.  Tr. 1136.

On December 14, 2011, Shultz sought treatment at a clinic for difficulty swallowing; he also complained of back pain.  Tr. 1226.  He reported that the emergency department had previously given him Percocet for his back pain and he requested more.  Tr. 1226.  Upon

examination, Shultz's findings were unremarkable.  Tr. 1227-1228.  Ian Britton, M.D., noted that Shultz had a history of malingering.  Tr. 1228.  Dr. Britton wrote, "offered tramadol as an alternative [to Percocet], stated he would just go to ED [to get] [P]ercocet, advised him not to do this.  Patient declined tramadol when offered."  Tr. 1228.

On December 12, 2011, Shultz saw Dr. Greco complaining of chronic neck and back pain.  Tr. 1239.  Shultz was negative for straight leg raising, bilateral.  Tr. 1240.  Dr. Greco was "reluctant to give him a narcotic" but prescribed a low dose of codeine with Tylenol.  Tr. 1240.

On January 17, 2012, Shultz saw Jane Li, D.O., for a complete physical examination. Tr. 1185-87.  Shultz reported pain upon bilateral straight leg raising and stiffness when he moved his lower back.  Tr. 1186.  Dr. Li prescribed medication for muscle spasms and dietary changes. Tr. 1186.

On January 16, 2012, Shultz saw Susan Likovich, a licensed chemical dependency counselor, for a mental health intake assessment.  Tr. 1281.  Shultz reported poor reading and writing skills that he hoped to improve so that he could obtain his GED.  Tr. 1281.

On February 6, 2012, Shultz visited the emergency room complaining of back pain and severe neck pain and was seen by Dr. Kapur.  Tr. 1268.  Upon examination, Shultz had full strength in his arms and legs, intact sensation, normal reflexes, could heel and toe walk, and had negative straight leg raise tests bilaterally.  Tr. 1270.  He had mild tenderness in his back.  Tr. 1270.  Dr. Kapur commented that he remembered Shultz from his prior visit.  1270.  Dr. Kapur noted, "no indication for emergent MRI," and advised Shultz that he would not prescribe narcotics for his chronic condition and that Shultz will need to see Dr. Greco.  Tr. 1270.  Dr. Kapur diagnosed Shultz with chronic neck and back pain.

Shultz visited the emergency room in March 2012 for neck and back pain after reportedly tripping and falling while carrying a headboard up the stairs in December 2011.[2]  Tr. 1252.  Upon examination, Shultz had full strength, no range of motion deficits, and mild tenderness over his entire neck and back.  Tr. 1252.  He was prescribed Motrin for pain.  Tr. 1252.

On March 9, 2012, Shultz saw nurse practitioner Belinda Brown in a follow up visit.  Tr. 1319.  Brown wrote, "unable to read and write."  Tr. 1320.  She increased the amount of prescribed Amitriptyline for Shultz's back and neck pain.  Tr. 1320-1321.

On March 26, 2012, Shultz saw Dr. Greco complaining of low back pain radiating into his right leg, shoulder blade pain, and right knee pain.  Tr. 1359.  He reported that his kneecaps are cracking and that sometimes his right knee seizes up when he tries to stand.  Tr. 1359.  Upon examination, Dr. Greco found that Shultz had right knee pain with thirty degrees flexion and a positive straight leg raise.[3]  Tr. 1359.          He had no swelling, tenderness, or crepitus.  Tr. 1359.  He asked Dr. Greco to "write him a letter for disability" when the appointment was over.  Tr. 1359.  An x-ray of his right knee was normal.  Tr. 1364.  Dr. Greco prescribed Shultz a trial of an increased dose of Neurontin and referred him to pain management.  Tr. 1360.

On June 6, 2012, Shultz visited the emergency room complaining of low back pain a day after he fell while pulling a brick from underneath a railroad tie.  Tr. 1370.  He had full range of motion in his back and full range of motion and strength in his extremities.  Tr. 1371.  He had no radiculopathy in his back, negative straight leg raise, and a normal gait.  Tr. 1371.  He was diagnosed with a lumbar sprain with radiculopathy and prescribed Flexeril and Ibuprofen.  Tr. 1371.

---

[2]  The exact date of this visit is not discernable from the record.

[3]  In a straight leg-raising test, the patient lies down supine, fully extends the knee, and lifts the leg.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1900.  Leg pain when the leg is raised 30-90 degrees (a positive straight leg raise) indicates lumbar radiculopathy.  *Id.*

On June 15, 2012, Shultz was discharged from Y-Haven, a treatment program, because he violated the rules against alcohol and he failed to follow through with his "commitment to recovery." Tr. 1338.  At discharge, Shultz's counselor noted that he had difficulty taking his pain medication as prescribed and was found to be taking more than directed.  Tr. 1337.  As a result, his medication was locked in a separate location and he began using a weekly medication box.  Tr. 1337.  The counselor noted that Shultz did not understand what his medications were for and when to take them and that pictures were placed on his medication sheets so that he would know what to take and when.  Tr. 1337.  The counselor described Shultz's problems with his sobriety program; specifically, he failed to maintain contact with his sponsors and was caught drinking on the premises.  Tr. 1337-1338.  He had taken reading classes and was encouraged to continue them.  Tr. 1338.  He indicated an interest in working but stated that his attorney told him he could only work less than 20 hours per week.  Tr. 1338.  He described a general laborer job he held for less than one week before injuring his back.  Tr. 1338.  His counselor advised he find a more sedentary position; Shultz returned to his laborer job but then said he quit because he did not get paid as expected.  Tr. 1338.

On June 29, 2012, Shultz saw Dr. Greco complaining of low back pain radiating to his right knee.  Tr. 1387.  He reported that he was unable to fill his Flexerial and Ibuprofen prescription because of the rules at Y–Haven.  Tr. 1387.  He stated that he was homeless but temporarily living in a vacant house owned by a friend.  Tr. 1387.  Upon examination, Shultz had a negative straight leg raise test but an absent right ankle jerk, mild weakness in his right leg, and hip flexor strength 4/5.  Tr. 1387.  Dr. Greco opined that Shultz's back pain "by itself" would not be disabling but that the "combination of everything that he is dealing with makes it impractical for him to be employed gainfully."  Tr. 1388.  He prescribed anti-inflammatories and

muscle relaxants.  Tr. 1388.  He also completed paperwork in connection with Shultz's disability application.  Tr. 1387.

On July 11, 2012, Shultz saw Dr. Greco again.  Tr. 1393.  He complained of back pain and reported that sometimes his right leg will just "give out."  Tr. 1392.  Dr. Greco wrote, "it is difficult to know exactly which of his medications he is taking, as he cannot read."  Tr. 1393. Shultz denied abusing alcohol or prescription pain medication.  Tr. 1393.  Upon examination, Shultz had negative straight leg raise, good reflexes, and good strength.  Tr. 1393.  Dr. Greco stated that he did not believe that Shultz was a surgical candidate and that Shultz did not seen interested in injections.  Tr. 1393.  He warned Shultz about the dangers of taking pain medication and addictions.  Tr. 1393.

On August 13, 2012, Shultz followed up with Dr. Greco with respect to his back pain. Tr. 1398.  He reported that he was doing "various manual labor jobs for money."  Tr. 1398.  He was taking 20 Vicodin per month for pain but did not feel that was enough.  Tr. 1398.  He asked about a cane, explaining that he sometimes experienced severe pain when walking and feels like he is going to fall.  Tr. 1398.  He also asked about a back brace.  Tr. 1398.  Upon examination, he had an "ok" gait, negative straight leg raise bilaterally, and appeared well.  Tr. 1398.  Dr. Greco prescribed a cane and increased his Vicodin medication.  Tr. 1398.

On September 2, 2012, Shultz visited the emergency room after falling down about six stairs several hours earlier.  Tr. 1403.  He initially stated that he might have had a seizure but later stated that he was kicking something down the steps, lost his footing, and fell.  Tr. 1403. He admitted that he consumed 5 or 6 beers and that he took his seizure medication.  Tr. 1403. Upon examination, Shultz had full range of motion in all extremities, full strength, sensation, and coordination.  Tr. 1404.  He was prescribed pain medication.  Tr. 1404.

On September 6, 2012, Shultz visited the emergency room for abdominal pain after having a seizure a few days prior.  Tr. 1429.  A CT scan of his abdomen and pelvis showed bilateral L5 pars defect resulting in one centimeter spondylolisthesis, severe degeneration of the discs at the L5 level, and associated severe bilateral foraminal stenosis.  Tr. 1438.

On October 23, 2012, Shultz saw pain management physician Fares A. Raslan, M.D., upon Dr. Greco's referral.  Tr. 1568.  Shultz reported a pain level of 10/10 that was relieved by sitting down.  Tr. 1568.  Dr. Raslan's examination revealed mild paravertebral tenderness in the area of Shultz's lower spine and his straight leg raise was positive at 40 degrees.  Tr. 1569.  He had good flexion, extension, lateral bending and rotation.  Tr. 1569.  He had symmetrical deep tendon reflexes and normal toe and heel walking.  Tr. 1569.  Dr. Raslan diagnosed Shultz with lumbar degenerative disc disease with grade 1-2 spondylolisthesis at L5-S1 and right sided L4 radiculopathy.  Tr. 1569.  Dr. Raslan prescribed an L4-5 lumbar epidural steroid injection, Vicodin, and Flexeril.  Tr. 1569.  Shultz received the injection on November 15, 2012.  Tr. 1577.

On December 17, 2012, Shultz saw Abdallah I. Kabbara, M.D., for an initial evaluation of his complaints of chronic back pain.  Tr. 1534.  Shultz went to Dr. Kabbara after he was unable to get an earlier appointment for an injection with another doctor.  Tr. 1534.  He reported that his back pain started seven years prior as a result of a car accident.  Tr. 1534.  He stated that a past epidural steroid injection was beneficial until he fell in November 2012.  Tr. 1534.  Upon examination, Dr. Kabbara noted that Shultz walked with an antalgic gait but had a normal range of motion and no tenderness in his lumbar spine.  Tr. 1535.  He had normal strength and senses, negative straight leg raise, and symmetric reflexes with no edema.  Tr. 1535.  Dr. Kabbara referred him to a physical therapy evaluation and a surgical consultation with Dr. Goel.  Tr. 1535.  He advised Shultz that he would perform steroid injections on an as-needed basis and to

10

discontinue opioid use because he was not getting any improvement with Vicodin.  Tr. 1535.  He administered an epidural steroid injection at L5-S1.  Tr. 1532.

On January 21, 2013, Shultz saw Dr. Greco and stated that he fired his pain management doctor who was prescribing him 70 Vicodin per month.  Tr. 1581.  Dr. Greco observed that records showed that Shultz's last refill medication was on January 5; Shultz reported that he lost access to his medications due to a problem with bedbugs in his residence and that he had not been able to obtain new pain medication.  Tr. 1581.  Dr. Greco commented that he was "very reluctant" to give Shultz narcotics, stating, "I am always suspicion when narcotics are stolen, disappear, etc.  I am also suspicious when patients fire their pain doctors."  Tr. 1582.  Dr. Greco prescribed tramadol while awaiting results of a toxicology screen and while attempting to contact Shultz's pain management physician.  Tr. 1582.  Shultz's toxicology screen was negative for opiates and positive for alcohol.  Tr. 1586.  Dr. Greco refilled his tramadol but warned that it would be the "last time that I will replace any 'lost' medications for him."  Tr. 1601.

On February 3, 2013, Shultz visited the emergency room complaining of back pain after falling on ice the previous day.  Tr. 1604.  Dr. Laskey noted that Shultz had called Dr. Greco the previous day requesting a refill of Vicodin or tramadol and that he never received them.  Tr. 1605.  Upon examination, Shultz had no tenderness and normal straight leg raise, sensation, and strength.  Tr. 1606.  X-rays taken to reassure Shultz revealed severe degenerative disc disease at L5-S1 with posterior spondylolisthesis of S1, not significantly different than on his prior examination.  Tr. 1606.  Dr. Laskey noted, "spondylolysis of L5 appears normal."  Tr. 1606.

On February 5, 2013, Shultz saw physical medicine and rehabilitation physician Lynn Jedlicka, M.D., for his low back pain.  Tr. 1662.  Shultz reported his back pain began four or five years ago, gradually worsening, and that "yesterday the pain increased suddenly to the point of

going to the ED at Metro for eval[uation]."  Tr. 1662.  He stated that when he stands or walks his pain sometimes increases to a 10/10.  Tr. 1662.  Dr. Jedlicka commented that Shultz was a poor historian regarding his prescriptions.  Tr. 1662.  Upon examination, Shultz's gait was slow but stable and heel, toe, and tandem walking were intact.  Tr. 1663.  He had a slightly decreased lordotic curvature, scoliosis on lumbar flexion, and impaired lumbar range of motion.  Tr. 1663. Straight leg raises were negative bilaterally, reflexes were somewhat brisk, and senses and motor strength was normal.  Tr. 1663-1664.  Dr. Jedlicka declined to prescribe opiates until she received Shultz's records and indicated that physical therapy was possible.  Tr. 1664.

On February 11, 2013, Shultz saw Dr. Greco complaining of back pain and blood pressure.  Tr. 1627.  He was living at the City Mission and working in the laundry.  Tr. 1627.  He stated that he has an active prescription for tramadol but has not filled it because he has been unable to walk to the pharmacy.  Tr. 1627.  He reported that tramadol often works when he gets shots at the same time. Tr. 1627.  Upon examination, Shultz's gait was normal.  Tr. 1628.  Dr. Greco stated, "For his back I will have him fill the tramadol, and also try naproxen."  Tr. 1628.

Shultz returned to Dr. Jedlicka for a follow-up appointment on February 12, 2013.  Dr. Jedlicka commented that Shultz is "repeatedly asking for Vicodin and Flexeril, states that he knows what he needs and that voltaren [is] not going to help.  But yet he states cannot recall if even had voltaren in the past."  Tr. 1668.  Dr. Jedlicka prescribed a trial of Flexeril and Voltaren and "no other nsaids in the interim."  Tr. 1669.   An x-ray of Shultz's lumbar spine revealed grade 2 anterolisthesis of L5 on S1 with severe disc space narrowing and a L5 pars defect.  Tr. 1671-1672.

On February 21, 2013, Shultz saw pain management physician Sumit Katyal, M.D.  Tr. 1673-1678.  Shultz reported that his back pain began five years ago after he fell off a loading

dock at work and that his symptoms have been worsening.  Tr. 1673.  His pain is exacerbated by walking and mitigated by sitting, medications and ice.  Tr. 1673.  Upon examination, Shultz had normal strength in his arms and legs bilaterally with no atrophy.  Tr. 1673.  He had negative straight leg raises, no pain to palpation over his lumbar spine and paraspinous muscles, and a normal range of motion in his back and all extremities.  Tr. 1675.  He had pain with facet loading and back extension/rotation.  Tr. 1675.  His gait, reflexes, and sensation were normal.  Tr. 1675.  Dr. Katyal prescribed Vicodin, referred him to physical therapy, and prescribed an injection, which was administered on February 26, 2013.  Tr. 1676, 1679-1681.

On March 4, 2013, Shultz reported to Dr. Greco that a pain medicine specialist was now prescribing his narcotics and that he was moving to the Salvation Army.  Tr. 1649.  He requested a refill on "all [his] medications" because he was worried he would not be able to get them for the next fourteen days because he would be unable to leave the Salvation Army during that time.  Tr. 1649.  He stated that his pain was well controlled, that he was walking without a back brace or a cane, and that he was doing a lot of walking because he did not have a car.  Tr. 1649.  Dr. Greco advised him to continue his current medication regime and to follow up in three months.  Tr. 1649.

**Medical Evidence Submitted to the Appeals Counsel**:  On March 14, 2013, Shultz returned to Dr. Katyal for a follow up visit.  Tr. 1717.  He reported that his low back pain had improved 75% following his previous injection.  Tr. 1717.  He used a back brace for daily functions.  Tr. 1717.  He requested another injection.  Tr. 1719.  Dr. Katyal diagnosed Shultz with lumbosacral neuritis and Shultz received a right L5 and S1 therapeutic transforaminal epidural steroid injection on March 26, 2013.  Tr. 1719, 1722.

On April 5, 2013, Shultz attended a physical therapy evaluation.  Tr. 1726.  On April 16, 2013, Shultz had another transforaminal epidural steroid injection.  Tr. 1731.

On May 13, 2013, Shultz returned to Dr. Katyal for a follow up appointment to have his medications refilled.  Tr. 1736.  Shultz reported persistent back pain, increased with prolonged walking and ambulating.  Tr. 1736.  His pain was alleviated for about two weeks following injections.  Tr. 1736.  He did not attend his last four sessions of physical therapy but was doing some exercises at home.  Tr. 1736.  He had increased his Percocet dosage and requested Dr. Katyal prescribe an increase in his dosage.  Tr. 1736.  Dr. Katyal warned Shultz that Shultz cannot increase his dosage without permission and that he cannot get pain medication from two prescribers, including tramadol from Dr. Greco.  Tr. 1737.  Dr. Katyal increased Shultz's Percocet dosage and encouraged him to continue physical therapy.  Tr. 1737.  He noted that Shultz was not interested in discussing his x-ray results with a spine surgeon.  Tr. 1737.

On June 3, 2013, Dr. Katyal noted that Shultz had good relief lasting at least a month after his injections but that his medications were not as effective.  Tr. 1742.  Dr. Katyal referred him for a spine surgery consultation for persistent pain and secondary grade 2 spondylolisthesis.  Tr. 1742.  On June 16, 2013, Dr. Katyal prescribed a lumbar MRI, physical therapy, and recommended a surgical evaluation.  Tr. 1748.

On June 22, 2013, Shultz visited the emergency room complaining of unbearable low back pain.  Tr. 1754.  Shultz reported that "he works at a car washing center, does shampooing, and has to hold the heavy water hose, etc., so took more Percocet than was prescribed."  Tr. 1754.  As a result, he was out of his medication.  Tr. 1754.  Upon physical examination, Shultz had a positive straight leg raise at 70 degrees but had a normal range of motion and no tenderness in his back.  Tr. 1755.  He was diagnosed with acute exacerbation of chronic back pain, given

twelve Percocet pills, and instructed to speak to his pain management doctor at the beginning of the week.  Tr. 1755.

On July 25, 2013, Shultz underwent a right L4 and L5 transforaminal epidural steroid injection.  Tr. 1767.  On August 23, 2013, Shultz visited the pain management clinic for a follow up and to get his medications refilled.  Tr. 1772-1773.  He reported that his pain has been stable and rated it as 8/10.  Tr. 1772.  On September 17, 2013, he described his pain as 7/10.  Tr. 1776. The treatment note reads, "has been told by Dr. Katyal on numerous occasions to make appointment with neurosurgery and he has not done so."  Tr. 1776.  On September 18, 2013, he reported his pain as 6/10.  Tr. 1780.

On September 25, 2013, Shultz underwent an MRI which showed grade 2 anterolisthesis of L5 on S1 with severe disk space narrowing; severe facet and ligamentous hypertrophy from L2-L3 through L5-S1 with no canal narrowing and moderate foraminal narrowing at L5-S1; and bilateral pars defects at L5-S1.  Tr. 1750-1751.  On October 8, 2013, Shultz received a transforaminal epidural steroid injection.  Tr. 1788.

On November 5, 2013, Shultz went to the emergency room after falling down the stairs outside the hospital.  Tr. 1298.

On November 25, 2013, Shultz returned to Dr. Greco.  Tr. 1816.  The treatment note recites the surgical consultant's advice to Shultz on November 5, 2013; namely, that his back pain is "likely in part related to" his isthmic spondylolisthesis of L5-S1, grade 2, and that surgery was not recommended due to questions regarding drug use, prescription drug use and smoking that could lead to a suboptimal outcome.  Tr. 1816.  Shultz tested positive for marijuana but stated that he used it one time only, prior to being tested.  Tr. 1816.  He previously had three

negative tests for marijuana.  Tr. 1816.  Shultz was referred for another surgical consultation.  Tr. 1818.

On December 2, 2013, Shultz visited the emergency room for lower back pain that radiated down his right leg and knee.  Tr. 1830.  He had run out of Percocet.  Tr. 1830.  He was using a back brace and crutches.  Tr. 1830.  He was diagnosed with acute chronic back pain.  Tr. 1838.

On December 23, 2013, Shultz returned to the emergency room for moderate and constant lower back pain that radiated down his right buttock and right leg, which had become worse after a fall a few weeks prior.  Tr. 1902.  He was out of medication.  Tr. 1902.  He was unable to receive more steroid injections because he had received four injections already, the maximum number of injections permitted in one year.  Tr. 1902.  He was using a wheelchair.  Tr. 1902.  His x-ray results were similar to prior testing.  Tr. 1906.  He was given a toradol injection and prescribed flexeril and naproxen.  Tr. 1906.

On January 2, 2014, Shultz consulted surgeon Bulent Yapicilar, M.D.  Tr. 1948-1954. Dr. Yapicilar gave him treatment options, including surgery.  Tr. 1954.

On May 5, 2014, in a psychological evaluation, Shultz reported that he was scheduled for back surgery on June 30, 2014.  Tr. 12.  He also reported that he was unable to read and write. Tr. 12.

**C.  Medical Opinion Evidence**

**1.  Treating physician**

On April 19, 2013, Dr. Greco completed a medical source statement.  Tr. 1687-1688. Dr. Greco opined that Shultz could occasionally and frequently lift/carry 5 pounds; could stand/walk for 4 hours in an 8-hour day for 15 minutes at a time, noting that he uses a cane

16

because his right leg "gives out"; could sit without limitation; could occasionally climb stairs because of low back pain; and could frequently reach, push, pull, and perform manipulative activities; and had no environmental limitations.  Tr. 1687-1688.  Dr. Greco was unable to assess Shultz's abilities to balance, stoop, crouch, kneel, and crawl.  Tr. 1687-1688.  He indicated that Shultz had been prescribed a cane and brace and would need to alternate between sitting, standing, and walking at will.  Tr. 1688.

### 2.  Consultative Examiners

On December 15, 2011, Shultz saw consultative psychologist David House, Ph.D., for a psychological evaluation.  Tr. 1169-1177.  Shultz stated that he had a sixth grade education and had "major difficulties with reading."  Tr. 1170.  Dr. House opined that Shultz had academic difficulties and was likely of low borderline intelligence, but added that no assessment was ordered and he did not administer an examination.  Tr. 1175.  He commented that there is not enough information to diagnose Cognitive Disorder, Not Otherwise Specified.  Tr. 1175.

### 3.  State Agency Reviewers

On June 16, 2011, Gary Hinzman, M.D., a state reviewing physician, reviewed Shultz's record.  Tr. 166.  Dr. Hinzman opined that Shultz retained the ability to perform medium exertional work with the following limitations: could occasionally lift or carry 50 pounds and frequently lift or carry 25 pounds; could sit, stand, or walk for up to 6 hours of an 8-hour work day if provided normal breaks; could occasionally stoop and crouch but never climb ladders, ropes, or scaffolds; and should avoid using moving machinery, exposure to unprotected heights, and driving.  Tr. 166.

On November 25, 2011, state reviewing physician Leon D. Hughes, M.D., reviewed Shultz's record.  Tr. 180-182.  Dr. Hughes's opinion was consistent with Dr. Hinzman except

that Dr. Hughes opined that Shultz could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds, could frequently balance, and could occasionally perform other postural activities but never perform hazardous climbing.  Tr. 181.

### D.  Testimonial Evidence

#### 1.  Shultz's Testimony

Shultz was represented by counsel and testified at the administrative hearing.  Tr. 107-123.  He is unmarried and has no children.  Tr. 108.  He lives at a homeless shelter and is trying to move into the Salvation Army.  Tr. 108-109.  He is unable to drive because he lost his driver's license after a DUI.  Tr. 115.

Shultz testified that he got as far as eighth or ninth grade in school.  Tr. 110.  He quit when he was sixteen and stated that he cannot read or write at all.  Tr. 110.  If you gave him a grocery list, he would be able to "figure it out" because, "you know what it says, you pretty much know what you're getting anyways.  It's hard, but, yeah, I could do it."  Tr. 110.  He stated that he is unable to learn.  Tr. 110.  He cannot read the names on the bottles of his medications and confirmed that a weekly medication box was created by Y-Haven with pictures on it.  Tr. 121.  He was in special education classes in school and "they passed me every year not knowing how to read and write."  Tr. 122.

Shultz asserted that he last worked in 2003.  Tr. 111.  He could no longer work because his back "wouldn't allow me" and he "always took way too long."  Tr. 111.  He last worked detailing cars and bussing tables at a restaurant.  Tr. 111-112.  He spent time in prison for theft and check forgery.  Tr. 116.  He never used illicit drugs but he has a problem with alcohol and currently attends Alcoholics Anonymous meetings "every chance I get" because he likes to get away from the homeless shelter.  Tr. 116.  He does not know what step he is on, but guessed Step

Four.  Tr. 116.  He last drank two months prior to the hearing and last got drunk about four years prior to the hearing.  Tr. 116-117.  He also testified that he smokes, and, although he had a patch to try to stop smoking, he never used it.  Tr. 119.

Shultz takes ten different medications for a variety of problems.  Tr. 112.  He stated that his medications are effective and that he gets injections in his back and "do[es] therapy."  Tr. 115.  He uses a cane prescribed by Dr. Greco.  Tr. 120.  He does not use it "at home or at [the homeless shelter] but uses it when he is "walking or moving around" because his right leg gives out on him "once in a while, so I have to [use it]."  Tr. 120.  When asked if he needs the cane to stand, he answered, "No, not really, but I mean, my leg—I do—yeah, I use it."  Tr. 120.

Shultz stated that he last had an injection in his back a week prior to the hearing.  Tr. 122.  He stated that, at physical therapy, "we go real slow" and that it does not hurt that much.  Tr. 122.  Sitting is not comfortable because it hurts; it is sometimes better to get up and walk around a little bit.  Tr. 122.  The pain is in his lower back, mostly on the right side.  Tr. 122.  It radiates down to his knee.  Tr. 122-123.  He can stand for about a half an hour and can walk "a little bit longer" with his cane, although he goes slow.  Tr. 123.  He can sit for 45 minutes to an hour.  Tr. 123.

### 2.  Vocational Expert's Testimony

 Vocational Expert James Prim ("VE") testified at the hearing.  Tr. 123-133.  The ALJ discussed with the VE Shultz's past relevant work as an auto detailer and bussing tables.  Tr. 123-125.  The ALJ asked the VE to determine whether a hypothetical individual of Shultz's age, education and experience could perform his past relevant work if that person had the following characteristics: can perform light work; needs to avoid concentrated exposure to dust, odor, gases and fumes; can perform occasional postural activities with no ropes or scaffolds; can perform

jobs that do not require complex or detailed job processes, little in the way of change in thought process from day-to-day, and jobs that can be learned in 30 days or fewer; and can perform jobs that do not require more than occasional work-related interactions with the public, coworkers, and supervisors.  Tr. 126.  The VE answered that such an individual could not perform Shultz's past work because his past work exceeds the physical capability limitations for light work.  Tr. 126.  The ALJ asked the VE if there was any work that such an individual could perform.  Tr. 126.  The VE stated that such an individual could perform jobs as a garment folder (394,000 national jobs, 150 Ohio jobs), sorter (38,000 national jobs, 300 Ohio jobs), and hand packer (410,000 national jobs, 1,000 Ohio jobs).  Tr. 126-127.  The ALJ asked the VE if those jobs were an exhaustive list or a representative sample, and the VE stated that the jobs were a representative sample.  Tr. 127.

The ALJ next asked the VE whether the same hypothetical individual could perform any jobs if the individual was limited to performing sedentary work.  Tr. 127.  The VE answered that such an individual could perform jobs as a final assembler (229,000 national jobs, 400 Ohio jobs); table worker (410,000 national jobs, 1,000 Ohio jobs); and taper (10,000 national jobs, 400 Ohio jobs).  Tr. 127-128.  The ALJ asked, and the VE affirmed, that these jobs were a representative sample and not an exhaustive list.  Tr. 128.

The ALJ asked the VE how an individual's employability is affected if that individual will miss four or more days of work per month.  Tr. 128.  The VE answered that such an individual would be eliminated from all work in the national economy.  Tr. 128.  The ALJ asked the VE how an individual's employability is affected if that individual is less than 80% productive while on the job.  Tr. 128.  The VE replied that such an individual would be eliminated from all work in the national economy.  Tr. 128.  The VE explained that his answers

20

are opinions based on information he reviewed from the Bureau of Labor and Statistics, a national human resource survey, and his training and expertise.  Tr. 128-129.

Next, Shultz's attorney asked the VE to consider whether the hypothetical individual previously described by the ALJ who was limited to sedentary work could still perform sedentary work if that individual had the following additional limitations: needs a cane when standing and walking and would need to change position at least every 45 minutes.  Tr. 129.  The VE stated that the limitation that the individual change position every 45 minutes would not affect his ability to perform sedentary work, but that, based on job analysis of the aforementioned positions and reviewing several of the jobs onsite, it is his opinion that an individual requiring a cane would not be able to perform the sedentary jobs that he had previously listed.  Tr. 129.  Shultz's attorney asked if there would be other sedentary jobs that the individual could perform, and the VE stated that there would be sedentary jobs that the individual could perform physically but that the jobs would require reading, math, and language abilities that may not be present in this case.  Tr. 129-130.

The ALJ asked the VE a follow-up question seeking clarification on an individual's need to use a cane to perform sedentary jobs.  Tr. 130-131.  The VE stated that the use of a cane while sitting would not prohibit an individual from performing the three sedentary jobs previously mentioned.  Tr. 131.  He explained, however, that many individuals performing those jobs need to get up and walk away from the station to carry items to other locations in the production setting and that, based on his experience, the use of a cane "would not be conducive in that work environment."  Tr. 131.  The ALJ asked the VE whether the job of final assembler requires an individual to get up from the station and carry things to another location.  Tr. 131.  The VE answered that it depends on the work environment and the employer, and that the job may

require such activity.  Tr. 131.  The ALJ asked the VE how the job numbers provided by the VE would be affected if the individual would not get up and carry things away from the work station. Tr. 131-132.  The VE replied that the number of jobs would be "dramatically eroded and reduced" by 90%, a conservative estimation.  Tr. 132.  He explained that his opinion is based on his observation of similar positions in the industrial and production setting in which these jobs are performed.  Tr. 132.  The ALJ asked what percentage of the day an individual would be required to be on their feet, carrying things.  Tr. 132.  The VE stated that it would be less than one hour a day, and that the individual would be carrying less than ten pounds.  Tr. 132.  The ALJ asked if the individual could carry the ten pounds in one hand while using the cane in the other hand.  Tr. 132.  The VE replied that it would depend on what is being produced, explaining that some jobs require an individual to carry a tray in two hands.  Tr. 132.  He explained that he considered this when he reduced the number of jobs by 90%.  Tr. 132.

The ALJ asked the VE whether this would apply to the other jobs, table worker and taper. Tr. 132.  The VE stated that these two jobs were more sedentary and that there is not as much carrying involved.  Tr. 132-133.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

## IV. The ALJ's Decision

In his May 30, 2013, decision, the ALJ made the following findings:

1.  The claimant has not engaged in substantial gainful activity since March 25, 2011, the application date.  Tr. 88.

2.  The claimant has the following severe impairments: history of seizures, disorders of the back, bipolar disorder, a respiratory disorder, and anxiety disorder.  Tr. 88.

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 88.

4.  The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he is unable to work in environments with concentrated exposure to dusts, odors, gases and fumes; he is limited to occasional postural activities (such as crouching, stooping, kneeling, crawling, balancing, and climbing ramps or stairs) with no climbing ropes or scaffolds; he is limited to jobs that do not require complex or detailed job process; he is limited to jobs that have little in the way of change in job process from day to day; he is limited to jobs that can be learned in 30 days or fewer; and, he is limited to jobs that do not require more than occasional work related interaction with the public, co-workers and supervisor.  Tr. 91.

5.  The claimant is unable to perform past relevant work.  Tr. 93.

6.  The claimant was born on October 2, 1964 and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 93.

7.  The claimant has a limited education and is able to communicate (including reading and writing) in English.  Tr. 93.

8.  The claimant has no transferable job skills.  Tr. 93.

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 93.

10. The claimant has not been under a disability, as defined in the Social Security Act, since March 25, 2011, the date the application was filed. Tr. 94.

### V. Parties' Arguments

Shultz objects to the ALJ's decision on three grounds.  He argues that the ALJ's residual functional capacity (RFC) finding that Shultz can perform light work is not supported by substantial evidence, that the ALJ failed to include restrictions regarding Shultz's use of a cane and his illiteracy in his hypothetical question to the VE, and that new and material evidence justifies a remand under Sentence Six.[5]  Doc. 15, pp. 16-22.  In response, the Commissioner submits that substantial evidence supports the ALJ's decision and that a Sentence Six remand is not warranted. Doc. 17, pp. 15-20.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A.  Substantial evidence supports the ALJ's RFC determination

---

[5]  A Sentence Six remand is based on the identification of new and material evidence which, for good cause, was not submitted during the prior administrative hearings.  *See Faucher v. Secretary of HHS*, 17 F.3d 171, 175 (6th Cir. 1994).

Shultz argues that the ALJ erred when he found that Shultz can perform light work despite substantial evidence that he was impaired in his ability to stand and walk.  Doc. 15, p. 16. Shultz contends that objective medical evidence and his testimony "proves" that he could not sit, stand and walk for six out of eight hours in a workday and that he requires a cane to walk and stand.  Doc. 15, p. 17.  He also asserts that the ALJ failed to give controlling weight to treating source Dr. Greco's opinion.  Doc. 15, p. 18.

### 1.  Objective medical evidence and Shultz's testimony

In support of his argument that objective medical evidence proves that he cannot sit, stand and walk for six out of eight hours in a workday, Shultz cites to three medical records. Doc. 15, p. 17.  First, he cites an x-ray taken on February 12, 2013.  Doc. 15, p. 17; Tr. 1671- 1672.  Next, he cites Dr. Greco's opinion, which is not objective medical evidence.  Doc. 15, p. 17; Tr. 1688-1689.  *See, e.g*., 20 C.F.R. § 404.1529 ("Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption.")  Finally, Shultz cites the results of an MRI taken of his lumbar spine on September 25, 2013.  Doc. 15, p. 17; Tr. 1750-1751.  This MRI post-dates the date of the ALJ's decision, May 20, 2013.  The Court considers the MRI evidence, therefore, in conjunction with Shultz's argument that he is entitled to a Sentence Six remand based on new and material evidence, *infra*.

Thus, the only objective evidence (apart from the post decision MRI) Shultz cites to support his argument that he cannot sit, stand, and walk for six hours in an eight hour workday are his x-ray results from February 2013.  The result of the x-ray showed lumbar spine grade 2 anterolisthesis of L5 on S1 with severe disc space narrowing and an L5 pars defect.  Tr. 1671- 1672.  The ALJ, however, considered Shultz's spondylolisthesis and spondylolysis at L5-S1 and

lumbar degenerative disc disease.[6]  Tr. 88.  He also noted that objective medical evidence

showed no signs of nerve root compression, spinal arachnoiditis, or severe lumbar spinal stenosis

with pseudoclaudication.  Tr. 90.  The ALJ commented that treatment notes showed that Shultz

had negative straight leg raise testing, normal reflexes, and no sensation loss, muscle atrophy,

repeated and sustained muscle spasms, or muscle and motor weakness, all of which, the ALJ

remarked, are associated with intense and disabling back pain.  Tr. 88, 92, 1240, 1252, 1270,

1371, 1387, 1393, 1398, 1404, 1489, 1510, 1535, 1606, 1663-1664, 1675.  Although treatment

notes also reflect Shultz had positive straight leg raise testing on occasion, *see* Tr. 1186, 1359,

1569, the bulk of treatment notes showed negative straight leg raise testing, including more

recent records, as the ALJ noted.  Tr. 89, 91, 1663; *see also* Tr. 1371, 1387, 1393, 1398, 1535,

1606, 1645 (July 2012-February 2013).  Accordingly, the ALJ's finding that Shultz could

perform light work was supported by substantial objective medical evidence.  *See Jones v.*

*Comm'r of Soc. Sec.*, 336 F.3d 469, 476-477 (6th Cir. 2003) (the Commissioner's decision is

upheld so long as substantial evidence supports the ALJ's conclusion.).

The ALJ also considered Shultz's testimony.  Tr. 89.  He commented that Shultz testified

that he used public transportation to get to the hearing.  Tr. 89.  The ALJ observed that using

public transportation involves walking, standing, and sitting.  Tr. 89.  The ALJ remarked that

Shultz had reported to a physician that he has no problems sitting and that doing so relieves the

pain he experiences after standing and walking extensively.  Tr. 89, 1662.  The ALJ also cited

Shultz's statements made to Dr. House during a psychological exam that he cooks using a

microwave, cleans, does laundry, goes grocery shopping, and uses public transportation.  Tr. 89,

1175.  The ALJ observed that Shultz's "description of his usual daily activities contradicts his

---

[6]  Anterolisthesis is another name for spondylolisthesis.  *See* Dorland's, at 98.  Spondylolisthesis is the forward
displacement of one vertebra over another, usually due to a pars defect.  *Id*. at 1754.  Spondylolysis is the dissolution
of a vertebra.  *Id*.

allegation of complete and total disability.  When he chooses to, the claimant is able to live an independent lifestyle and exertionally perform at least light duty work.  He walks, stands, and sits, while suing public transportation, even when he allegedly requires a cane to walk."  Tr. 91. Thus, substantial evidence supports the ALJ's finding that Shultz's described limitations are not as severe as alleged.

### 2.  Dr. Greco's opinion

The ALJ did not give controlling weight or significant probative value to Dr. Greco's opinion.  Tr. 92.  Shultz argues that the ALJ cited "several facts" to support his finding, including that Dr. Greco did not request surgery and that Shultz would not be able to perform the aforementioned daily activities if he were as impaired as alleged. Doc. 15, p. 19.

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(a)-(d); *Bowen v. Comm'r of Soc Sec*., 478 F.3d 742, 747 (6th Cir. 2007).

Here, the ALJ explained that he did not give Dr. Greco's opinion controlling weight because his opinion is directly contradicted by Shultz's statements about his daily activities and other evidence in the record.  Tr. 92.  *See* 20 C.F.R. § 416.927(a)-(d) (the ALJ must consider the consistency and supportability of the opinion with the record as a whole).  The ALJ noted that Dr. Greco, Shultz's long-term attending physician, did not recommend surgery to treat Shultz's back, and that Shultz was treated conservatively by therapy, medication, exercise, and occasional epidural injections.  Tr. 92.  *See id.* (the ALJ must consider the length, nature and extent of treatment relationship and the specialization of the physician).  The ALJ also observed that Dr. Greco's opinion is not supported by his own treatment notes or the reports of other physicians.  Tr. 92.  *See id.*  Finally, the ALJ credited the opinion of the state agency reviewing physicians, Drs. Hunzman and Hughes, that Shultz is capable of performing light work.  Tr. 92.

Shultz argues that, after the ALJ's decision, Dr. Katyal and Dr. Greco requested a surgical consultation.  Doc. 15, p. 19.  However, a referral for a surgical consultation is not a referral for surgery.  Moreover, in July 2012, Dr. Greco opined that Shultz was not a candidate for surgery.  Tr. 1393.   Lastly, the ALJ did not err in not considering items not in existence at the time of his decision.  Accordingly, the ALJ properly followed the treating physician rule when determining that Dr. Greco's opinion is not entitled to controlling weight.  *See Wilson*, 378 F.3d at 544.

### B.  The ALJ erred when he failed to include a limitation based on Shultz's use of a cane in his hypothetical to the VE or explain why a cane was not medically necessary

Shultz argues that the ALJ "failed to incorporate proven restrictions" in his hypothetical question to the VE, i.e., that Shultz uses a cane and that he is "functionally illiterate."  Doc. 15, p. 20.

An ALJ's hypothetical question to the VE should focus on the claimant's overall state, including his mental and physical maladies. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002). However, an ALJ is only required to include limitations in a hypothetical question that he finds credible. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). Shultz argues that the ALJ erred in failing to provide an exertional limitation regarding the use of a cane in his hypothetical to the VE because Shultz's need for a cane "is established in the medical record." Doc. 15, p. 20.

Regarding the use of a cane,

[T]he Sixth Circuit has held that if a cane is not a necessary device for the claimant's use, it cannot be considered a restriction or limitation on the plaintiff's ability to work. *Carreon v. Massanari*, 51 Fed.Appx. 571, 575 (6th Cir.2002). This device must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the cane is medically necessary. *Penn v. Astrue*, 2010 WL 547491, at *6 (S.D.Ohio Feb.12, 2010). A cane would be medically necessary if the record reflects more than just a subjective desire on the part of the plaintiff as to the use of a cane. *Id.* If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the VE. *Casey v. Sec'y of Health Servs.*, 987 F.2d 1230, 1235 (6th Cir.1993). The ALJ is only required to pose to the VE those limitations found to be credible. *Id.*

*Murphy v. Astrue*, 2013 WL 829316, at *10 (M.D.Tenn. March 6, 2013).

On August 13, 2012, Dr. Greco prescribed a cane for Shultz after Shultz requested one based on his experiencing severe pain while walking and feeling "like he is going to fall down." Tr. 1398. That Dr. Greco prescribed a cane amounts to more than Shultz's subjective desire to use a cane. *See Murphy*, 2013 WL 829316, at *11 (the ALJ properly found the claimant did not need a cane when there was no evidence that the cane was prescribed). Although the ALJ did not find Shultz's "allegation of complete and total disability" credible (Tr. 91), the ALJ did not specifically state that he discredited Shultz's assertion that he needed a cane to walk. Indeed, the ALJ repeatedly commented that Shultz was able to walk "even while using a cane." Tr. 92, 91.

Thus, although the Commissioner implies that the ALJ discredited Shultz's need to use a cane (Doc. 18, pp. 18-19), the ALJ did not expressly do so and instead appeared to accept Shultz's testimony as to his need to use a cane.

Moreover, at the hearing, Shultz's attorney asked the VE to consider jobs a hypothetical individual with Shultz's described limitations at the sedentary level could perform if that individual used a cane while standing and walking.  Tr. 129.  The VE answered that such an individual could not perform the three sedentary jobs previously described because the individual may need to walk and carry items, such as a tray, with two hands.  Tr. 129-133.  The individual could not walk with a cane while using both hands to carry.  The ALJ followed up with vigorous questioning as to why sedentary work required walking; the VE explained that sedentary work includes some jobs that require an individual to get up and walk while carrying items to other locations.  Tr. 130-131.  The VE reduced the number of sedentary jobs the hypothetical individual could perform, if he needed a cane to walk, by 90%.  Tr. 132.  There was no testimony regarding how the use of a cane would impact the hypothetical individual's ability to perform light work.  In his decision, the ALJ found, without further explanation, that Shultz could perform light work; he provided no limitation for carrying a cane.

In light of the record, the ALJ was required either to include the use of a cane in his hypothetical to the VE or to explain his reasons for not including such a limitation.  The ALJ's failure to do either was error.  *See Casey*, 987 F.2d at 1235 (ALJ must incorporate a claimant's credible limitations in the hypothetical question to the VE).

Shultz also argues that the ALJ erred because he did not incorporate Shultz's illiteracy in his hypothetical to the VE.  Doc. 15, p. 20.  The ALJ considered Shultz's allegations of illiteracy; he noted that Shultz testified that he finished ninth grade but stated that he was unable to read

and write.  Tr. 89.  He also referred to prison records in which Shultz requested reading glasses so that he could read papers presented to him in order to sign them, and commented that Shultz appeared to have been able to complete SSI forms.  Tr. 89, 394, 414, 426.  Again, the ALJ found that Shultz's allegations of disability were contradicted by the record.  Accordingly, he provided no limitations in his hypothetical to the VE for Shultz's alleged illiteracy.

Shultz argues, "the record is replete with references of Plaintiff's illiteracy and attempts by other[s] to assist him with his inability to read."  Doc. 15, p. 21.  In support, he cites a Y-Haven record indicating that Shultz was given a medicine sheet with pictures "because he was unable to read the names of the medications."  Doc. 15, p. 21; Tr. 1337.  First, an inability to understand what medications to take and when does not necessarily mean that Shultz is illiterate, especially given the number of medications he takes.  *See* Tr. 122 (listing 10 medications).  Next, the record also reflects that Shultz repeatedly took more medication than prescribed; it does not follow that he did this because he could not read.  *See, e.g*., Tr. 1754 (Shultz explaining that, because he was working at a car wash using a heavy water hose, he took more Percocet than prescribed); 1337 (reporting that Shultz took more Gabapentin/Neurontin for pain than prescribed); 1171 (Shultz reporting taking Percocet for pain although it had not been prescribed).  Finally, in the same record Shultz cites for support, a counselor encouraged Shultz to continue with his reading classes, commenting that he should "try to *improve his skills further*" and noting that Shultz "was able to read the first 3 steps for his coin out ceremony."  Tr. 1338.

In sum, because the ALJ did not explain whether he found Shultz's use of a cane to be a medical necessity, and instead appeared to endorse Shultz's cane use, the ALJ erred when he failed to include the use of a cane in his hypothetical to the VE.  The ALJ did not err in failing to include Shultz's alleged illiteracy in his hypothetical to the VE; the ALJ sufficiently explained

that he did not find Shultz's allegations regarding illiteracy credible.  *See Casey*, 987 F.2d at

1235.

> ### C.  A Sentence Six remand is not warranted

Shultz argues that new and material evidence that he submitted to the Appeals Council

justifies a remand under Sentence Six.  Doc. 15, p. 22.  A Sentence Six remand is warranted

when the claimant identifies new and material evidence which, for good cause, was not

submitted during the prior administrative hearings.  *Faucher v. Secretary of HHS*, 17 F.3d 171,

175 (6th Cir. 1994).  "Evidence is new only if it was not in existence or available to the claimant

at the time of the administrative proceeding."  *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447

F.3d 477, 484 (6th Cir. 2006) (quoting *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)).

Evidence is material if it "would likely change the Commissioner's decision."  *Bass v. McMahon*,

499 F.3d 504, 513 (6th Cir. 2007) (citing *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d

709, 711 (6th Cir. 1988)).

Shultz asserts that evidence immediately preceding and following his hearing is new and

material.  Doc. 15, p. 23.  He argues that it is material because it relates to his condition at the

time of the hearing and provides "further proof that the ALJ erred in the assessment of Plaintiff's

RFC."  Doc. 15, p. 23.  Specifically, Shultz identifies records dated "April 2013," one month

before the hearing, through January 2014, reflecting that he "continue[d] to have significant

lumbar pain."  Doc. 15, p. 23 (citing Tr. 1741-1742, 1748, 1948, 1954).

First, the earliest of these records is dated May 31, 2013, after the hearing.  Tr. 1740-

1742.  Moreover, in that record, Shultz reported to Dr. Katyal that "the pain has been excellent

with 100% pain relief with injections for a month and has been doing well with the pain

medications." Tr. 1740.[7] Shultz also had negative straight leg raising, a normal gait, and full

strength, sensation, and range of motion in his extremities.  Tr. 1742.  He had pain with palpation

of his lumbar spine and paraspinous muscles and pain with facet loading and back extension and

rotation.  Tr. 1742.  However, on his next visit, he had no pain to palpation and a normal range of

motion in his back and extremities and, again, a normal gait.  Tr. 1748.  These records are

consistent with the records before the ALJ, which reported generally normal findings.  Shultz has

not shown that these records would have likely changed the ALJ's decision.  *See Bass*, 499 F.3d

at 513.

       Shultz also argues that he received two surgical consults after the ALJ's decision.  Doc.

15, p. 23.  On May 31, 2013, Dr. Katyal advised, "consultation to spine surgeon for

consideration of surgery for persistent pain secondary grade II spondylisthesis."  Tr. 1742.  On

June 19, 2013, Dr. Katyal again recommended a surgical consultation in addition to physical

therapy.  Tr. 1748.  On January 2, 2014, surgical consultant Dr. Yapicilar stated, "I discussed

with the patient treatment options including surgery."  Tr. 1954.  This evidence does not amount

to a surgical recommendation.  The only other indication with respect to surgery in the record

that Shultz identifies is a psychological diagnosis evaluation dated May 13, 2014, wherein Shultz

states that he has back surgery scheduled for June 30, 2014.  Tr. 11-13.  This record is nearly one

year after the ALJ's decision.  Shultz has not shown that a purported scheduled surgery that he

himself related to a psychological evaluator is material, given that, less than one year prior to the

ALJ's decision, Dr. Greco had opined that Shultz was not a candidate for surgery (Tr. 1393); six

months after the ALJ's decision a surgeon opined that Shultz's back pain was "in part related to"

---

[7]  Shultz also rated his pain as 8/10 at that visit.  Tr. 1741.  The Court notes that a prior record indicated that he rated his pain as 8 on the best day and 7 on the worst day, Tr. 1673, indicating there may be some confusion as to whether Shultz rates his pain as more severe with higher numbers or lower numbers.

his September 2013 MRI results and that, based on his use of narcotics and tobacco,  Shultz is

not a surgical candidate (Tr. 1816); and the absence of any medical record scheduling surgery.

Shultz points to MRI results dated September 25, 2013, revealing grade 2 anterolisthesis

of L5 on S1 with severe disk space narrowing; severe facet and ligamentous hypertrophy from

L2-L3 through L5-S1 with no canal narrowing and moderate foraminal narrowing at L5-S1; and

bilateral pars defects at L5-S1.  As noted, after this MRI, a surgeon opined that Shultz was not a

surgical candidate.  Tr. 1816.   Finally, Shultz points out that, six months after the ALJ's

decision, after falling down some stairs, Shultz presented to the emergency room; the note reads,

"[Shultz] uses a wheelchair now."  Tr. 1902.  Again, Shultz has not shown that this evidence

would have likely changed the ALJ's decision.  *See Bass*, 499 F.3d at 513.  Accordingly, the

Court finds that Shultz is not entitled to a Sentence Six remand.  *See Hollon*, 447 F.3d at 483

(claimant bears the burden of establishing that new evidence would likely change the ALJ's

decision).

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED** and

**REMANDED** for further proceedings consistent with this opinion.


Dated: June 25, 2015

Kathleen B. Burke
United States Magistrate Judge

35